**SEARS, ROEBUCK AND CO.,**
Defendant Below,
Appellant,

v.

Maria S. MIDCAP, individually and as Administratrix of the Estate of Terry L. Midcap, Natalia Midcap, Sharon Midcap, Carla Midcap and Allstate Insurance Company a/s/o Terry Midcap (deceased) and Maria S. Midcap, Plaintiffs Below, Appellees/Cross Appellants.

v.

Southern States Milford Cooperative, Inc., Defendant Below, Appellee/Cross–Appellee, Cross–Cross Appellant.

No. 263, 2004.

Supreme Court of Delaware.

Submitted: Aug. 18, 2005.
Decided: Jan. 9, 2006.
Reargument Denied Feb. 6, 2006.

William J. Cattie, III, of Rawle & Henderson, L.L.P., Wilmington, DE; Craig C. Martin, Peter J. Brennan (argued) and Amanda S. Amert, of Jenner & Block, L.L.P., Chicago, IL, of counsel, for Appellant.

I. Barry Guerke (argued), of Parkowski, Guerke & Swayze, P.A., Dover, DE; and Sean J. Bellew, of Cozen O'Connor, Wilmington, DE; Paul R. Bartolacci (argued), of Cozen O'Connor, Philadelphia, PA, of counsel, for Appellees/Cross–Appellants.

Daniel P. Bennett (argued), of Heckler & Frabizzio, Wilmington, DE, for Cross–Appellee/Cross–Cross Appellant.

Michael P. Kelly and Paul A. Bradley, of McCarter & English, L.L.P., Wilmington, DE; David R. Schlee (argued) and Vincent R. McCarthy, of Schlee, Huber, McMullen & Krause, P.C., Kansas City, MO, of counsel, for Amici Curiae Propane Education & Research Council and National Propane Gas Association.

Before HOLLAND, BERGER and JACOBS, Justices, and STRINE and PARSONS, Vice Chancellors.[1]

JACOBS, Justice:

This is an appeal from a final judgment of the Superior Court, awarding damages as a result of the death of Terry Midcap from a gas explosion in his home. The plaintiffs-appellees are the Estate of Terry Midcap, his widow, and his daughters. Those parties brought a Superior Court action against defendant-appellant Sears, Roebuck & Co. ("Sears") and co-defendant cross-appellee, Southern States Milford Cooperative, Inc. ("Southern States"), asserting survival, wrongful death, and subrogation claims.[2] After trial, the jury returned a verdict awarding over $3.1 million damages in favor of the plaintiffs on their claims against Sears. The jury also returned a verdict against the plaintiffs on their claims against Southern States. Sears appealed from the verdict and judgment, and Southern States has cross-appealed.

Although Sears argues several grounds for reversal, we reverse the Superior Court's judgment against Sears on the ground that the trial court gave an erroneous "missing evidence adverse inference" instruction to the jury. We also affirm the judgment in favor of Southern States. Finally, we comment upon some, but decide only one, of the remaining claims of error on these appeals, and remand the case for a new trial in accordance with this Opinion.

## FACTS

On April 8, 1999, a gas explosion occurred at the Midcap home in Dover, Delaware. Terry Midcap died as a result of that explosion, which demolished the family home and left "a mere hole in the ground." The explosion resulted from a propane leak that originated from a kitchen range that the Midcaps had purchased from Sears in November 1995. Southern States, which was the Midcaps' gas supplier, owned the propane cylinders and the regulator components of the Midcaps' propane system.

Terry Midcap's Estate; Maria Midcap, his widow; and the Midcaps' three daughters, Carla, Sharon and Natalia, filed a survival and wrongful death action in the Superior Court against Sears and Southern States. Allstate Insurance Company, the Midcaps' insurance carrier, also brought a separate subrogation action against the defendants. Those actions were consolidated for trial.

Because the Midcaps' theory of liability against Sears was that the kitchen range had been improperly installed, the issue of who installed the range became a central issue at trial and was the subject of conflicting testimony. The plaintiffs claimed that Sears had installed the range; Sears claimed that an independent contractor had performed the installation. Sears was unable, however, to produce any documents evidencing who actually delivered the range and installed it at the Midcap home. In part because of the absence of such documents, the trial court instructed the jury that if it found that Sears had not adequately explained the absence of the documents, the jury could draw an inference that the evidence, if produced, would not have been favorable to Sears.

---

1. Sitting by designation pursuant to Art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4.

2. Allstate Insurance Company is a plaintiff in a separate subrogation action that was consolidated with the Midcaps' personal injury action.

The plaintiffs' claim against Southern States was that Southern States had not exercised due care in inspecting the Midcaps' propane supply system. The plaintiffs urged that if such an inspection had occurred, Southern States would have discovered the deficiencies in the Midcaps' system, and specifically, the improper fittings that connected the kitchen range to the propane system. The plaintiffs offered the expert testimony of Alan Bullerdiek to support its negligence claim. The trial court permitted Mr. Bullerdiek to testify, but precluded him from opining that the "GAS Check" program, which was a voluntary inspection program, constituted the relevant standard of care in the propane supply industry.

The jury returned a verdict in favor of Southern States, and against the plaintiffs, on all claims. The jury also returned a verdict against Sears and in favor of the plaintiffs, and awarded the plaintiffs the following amounts:

| | |
|---|---|
| To the Estate of Terry Midcap: | $ 500,000.00 |
| To Maria Midcap: | $1,084,794.00 |
| To Carla Midcap: | $ 542,396.00 |
| To Natalia Midcap: | $ 271,189.00 |
| To Sharon Midcap: | $ 271,189.00 |
| To Allstate Insurance | $ 462,116.25 |

Sears appeals from the judgment entered on that verdict. The plaintiffs cross-appeal from the verdict in favor of Southern States, and Southern States has responded by filing cross cross-appeals against the plaintiffs.

## ANALYSIS

### A. Sears' Claims on Appeal

On appeal from the jury verdict in favor of the plaintiffs, Sears claims that the Superior Court erred in three respects. First, Sears claims that the trial court erroneously gave a missing evidence adverse inference instruction without preliminarily determining that Sears had intentionally or recklessly destroyed the evidence in question. Second, Sears contends that the Superior Court erroneously admitted into evidence the expert opinion of Dr. Cyril Wecht, who testified that Terry Midcap had experienced pain and suffering before he died. Third, Sears argues that the Superior Court erroneously applied the collateral source rule so as to prevent the defendants from proving Maria Midcap's past and future receipt of payments from her deceased husband's Social Security and United States Air Force pension benefits.

### 1. The Adverse Inference Instruction

We first address Sears' claim that the Superior Court erroneously gave an adverse inference jury instruction against Sears without finding preliminarily that Sears' conduct merited such an instruction. The question of who installed the Midcaps' range was critical and hotly contested at trial. Maria Midcap testified that she recalled that a Sears truck had delivered the range, which two men wearing Sears uniforms had installed. Carla Midcap, one of Maria Midcap's daughters, testified that she remembered seeing a truck in the driveway with the Sears logo on the side panel. Sears' District Installation Manager, Richard Besler, testified that the Midcaps' stove was a "built in" range, which Sears' employees would not have been permitted to install because the stove operated with liquid propane gas. To deliver and install that range, Mr. Besler said, Sears would have used an outside contractor that (contrary to the Midcaps' testimony) would not have used a truck bearing a Sears logo on the side panel.

Sears produced records showing that the Midcaps had purchased the range in 1995 and had paid Sears a fee to deliver it. Sears could not, however, produce any record of the delivery, which would have taken the form of a "load sheet." When

called as a witness by the plaintiffs in their case at trial, Sears' Mr. Besler testified that Sears had moved its storage facility, and that the load sheet might have been misplaced in that move or may have been destroyed due to a document retention policy. Sears recalled Mr. Besler as a witness during its case-in-chief. At that point, Mr. Besler testified unequivocally (for the first time) that under Sears' document retention policy, the load sheet would have been destroyed one year after the installation. Then, when cross-examined about his inconsistent explanations, Mr. Besler stated that he was not certain that the document retention policy was in fact in place until he conducted further research following his initial direct testimony.[3] Because of the missing load sheet and the inconsistent explanations given for its absence, the plaintiffs requested, and the Superior Court gave, the following missing document adverse inference instruction to the jury:

> If a party acknowledges that it should have possession, custody, and control of a document or record that would have been produced and retained by it in the ordinary course of business, but fails to produce such document or record at trial without adequate explanation of the reasons for such nonproduction, then the jury is permitted to infer that had the document or record been produced by the party that should have possession, custody, or control of it, its contents would reveal information adverse to the party that failed to produce the document or record.

Plaintiffs contend that Defendant Sears has acknowledged that it should have in its possession, custody or control documents pertaining to the transaction and delivery of the range to the Midcap home. If you should find that the Defendant Sears has not adequately explained the absence of such document or record, then you may infer that if it had been duly produced for trial, it would contain information adverse to Defendant Sears in this case.

 Sears claims that the trial court erred because it was required to—but did not—make a finding, preliminary to and as a foundation for any instruction, that Sears' conduct was wrongful. That error, Sears argues, is reflected in the instruction itself, which did not require the jury to conclude that Sears had acted intentionally or recklessly in failing to retain the document. This Court reviews *de novo* the Superior Court's decision to issue a contested jury instruction.[4]

3. Sears did not produce any record reflecting that document retention policy.

4. *Corbitt v. Tatagari*, 804 A.2d 1057, 1062 (Del.2002). The plaintiffs argue that this Court should consider this issue only under a plain error standard of review, because Sears failed fairly to raise this issue at trial. Sears objected to the adverse inference instruction on the basis of Article IV, § 19 of the Delaware Constitution, which prohibits a judge from charging juries on matters of fact. Sears did not present clearly to the trial court the specific argument it now raises on appeal: that the court was required to make a preliminary finding of intentional or reckless misconduct before issuing an adverse inference instruction. The plaintiffs argue that under Supreme Court Rule 8, Sears cannot raise this argument on appeal. We disagree. Although Sears did not present that precise argument at the trial level, it did object generally to the issuance of the pattern jury instruction, and argued that the Superior Court should not rely on an earlier Superior Court case, *Burris v. Kay Bee Toy Stores*, 1999 WL 1240863 (Del.Super.Sept. 17, 1999), which held that an adverse inference instruction was proper where the plaintiff had negligently spoliated the physical evidence that formed the basis for her suit. Sears also cited several cases that addressed the requirement of a finding of willful or reckless conduct. In concluding that Sears fairly preserved its objection, we are importantly influenced by the

■ Two decisions of this Court support Sears' claim that before issuing a missing evidence adverse inference instruction, a trial court must first determine that a party acted willfully or recklessly in failing to preserve evidence. In *Equitable Trust Co. v. Gallagher,*[5] we stated that "[i]t is the duty of a court, in such a case of wilful destruction of evidence, to adopt a view of the facts as unfavorable to the wrongdoer as the known circumstances will reasonably admit."[6] In *Gallagher*, we reasoned that an adverse inference is consistent with human nature and common sense: if a party intentionally destroys evidence, it is reasonable to infer that the evidence was not favorable to that party.[7] But, and as Sears points out, that reasoning would not apply where the evidence is destroyed accidentally or where records are purged under a routine document destruction policy.

■ Similarly, in *Collins v. Throckmorton,*[8] this Court upheld the Superior Court's refusal to issue an adverse inference instruction where there was no evidence that the plaintiff had intentionally destroyed the records in dispute.[9] In *Collins* we recognized the general rule that an adverse inference is appropriate where a litigant intentionally suppresses or destroys pertinent evidence, but held that absent evidence of intentional conduct, no such inference was warranted.[10] Here, neither the judge's findings, nor the instruction given, applied or even alluded to the intentional or reckless standard. The trial judge made no finding that Sears had acted intentionally or recklessly, nor did the issued instruction require the jury to so find. All that the jury was instructed was that it could draw an adverse inference if Sears had not adequately explained the absence of the record.

The standard that the trial court adopted would penalize businesses and individuals simply because they failed to retain documents they were under no legal obligation to preserve. In this case, for example, the explosion occurred four years after Sears sold the range in question. To fault Sears for failing to retain the record of that sale would create an inefficient incentive scheme, whereby all records that might ever become evidence in a legal dispute would have to be perpetually retained, in order to avoid an adverse inference instruction. In our view, the better balance is to continue to embrace an adverse inference standard that requires a showing that a party acted with a mental state indicative of spoliation. By this means, the bad faith destruction of probative evidence will be discouraged without penalizing innocent persons who simply seek to get rid of old files in the ordinary course of business that they have no duty to retain.

---

plaintiffs' own decision to ask for an adverse inference instruction only on the eve of the last day of trial. Because the plaintiffs did not present this issue in the proposed instructions before trial, Sears was forced to react hurriedly in preparing its objection, an exigency caused by the plaintiffs' tactical choice. Thus, some lack of clarity on Sears' part was understandable. In this same regard, we note that the trial judge foreshortened the argument regarding this instruction and clearly signaled that he understood Sears' argument as being broader than the plaintiffs now claim it was. Given these circumstances, we find that Sears fairly presented below the argument it now presents to us.

**5.** 102 A.2d 538 (Del.1954).

**6.** *Id.* at 541.

**7.** *Id.*

**8.** 425 A.2d 146 (Del.1980).

**9.** *Id.* at 150.

**10.** *Id.*

We note in this connection that the federal courts have also adopted a standard that requires a preliminary determination of wrongful conduct. In *Morris v. Union Pac. R.R.,*[11] the Eighth Circuit found an adverse inference instruction improper where the trial judge determined that the defendant had not intentionally destroyed evidence.[12] The *Morris* Court held that "'there must be a finding of intentional destruction indicating a desire to suppress the truth,' before an adverse inference instruction is justified."[13] Similarly, in *Gumbs v. Int'l Harvester, Inc.,*[14] the Third Circuit held that to merit an adverse inference instruction, the party seeking the instruction must show that there has been an actual suppression or withholding of evidence, and that no adverse inference arises where the evidence is lost or accidentally destroyed or where the failure to produce it is otherwise properly explained.[15]

The plaintiffs contend that Delaware law does not require intentional destruction of evidence, and that an adverse inference instruction is permitted even where a litigant suppresses or destroys evidence negligently. The plaintiffs' legal support for that position consists of two Superior Court decisions that permitted adverse inference instructions in cases involving negligent destruction of evidence. Those

cases cite no precedent of this Court for their holdings, however.[16]

The plaintiffs also rely upon decisions that involved missing evidence instructions in criminal cases.[17] Those decisions are inapposite because a criminal "missing evidence" instruction is not equivalent to an adverse inference instruction in a civil case. In the criminal context, the court considers, as part of a six-factor balancing test, the degree of negligent or intentional conduct of the State in failing to preserve the evidence.[18] The criminal standard also requires the court to consider other factors, including the importance of the missing evidence, the availability of secondary evidence, and the sufficiency of other evidence presented at trial.[19] In a criminal case, the governmental agency that is accusing the defendant of a crime has a special duty to preserve evidence, because it, by virtue of its investigation of the crime, knows that there will likely be a later proceeding in which the evidence may be relevant to the defendant's efforts to avoid conviction.[20] And, importantly, a missing evidence instruction in a criminal trial rests upon constitutional considerations of due process. As this Court has recognized, even where a defendant is unable to prove that the State acted in bad faith, there may be circumstances where lost evidence is, nonetheless, so critical to the defense as to render a criminal trial

11. 373 F.3d 896 (8th Cir.2004).

12. 373 F.3d at 901.

13. *Id.*

14. 718 F.2d 88 (3d Cir.1983).

15. *Id.* at 96.

16. *Welsh v. Del. Clinical & Lab. Assoc.,* 2000 WL 33111147 (Del.Super.Nov. 9, 2000); *Bur-*

*ris v. Kay Bee Toy Stores,* 1999 WL 1240863 (Del.Super.Sept. 17, 1999).

17. *See, e.g., Lolly v. State,* 611 A.2d 956 (Del. 1992); *Hammond v. State,* 569 A.2d 81 (Del. 1989).

18. *See Lolly,* 611 A.2d at 959.

19. *Hammond,* 569 A.2d at 87.

20. *Deberry v. State,* 457 A.2d 744, 751–52 (Del.1983). *See also Lolly v. State,* 611 A.2d

fundamentally unfair.[21] Because those constitutional considerations are not present in a civil case, the plaintiffs' reliance on criminal case precedent is not persuasive on the issue before us.

■ The decisions of this Court and of the federal courts require a preliminary finding of intentional or reckless destruction of evidence as a predicate to an adverse inference instruction. The plaintiffs cannot point to any such finding being made in this case. In supplemental briefing, the plaintiffs argue that the trial judge must implicitly have determined that Sears' conduct was intentional or reckless, because the judge understood the law and by issuing the instruction, must be deemed to have concluded that the evidence supported a finding that Sears' conduct was intentional. The flaw is in that argument's premise: it is not clear that the trial judge understood the law. The judge's instructions to the jury reflect a different understanding—that an adverse inference instruction is justified, irrespective of fault, whenever the absence of evidence is not adequately explained. In an earlier case, *Burris v. Kay Bee Toy Stores,* that same judge held that "Delaware law does not require that the spoliation of evidence be intentional for an adverse inference to be drawn."[22] In a close case such as this, where the record does not reflect an explicit finding of intentional or reckless destruction at a time when Sears was under no duty to preserve the record, and where it is unclear that the trial judge understood such a finding to be required, this Court will not assume that a finding was implicitly made.

■ Finally, the issuance of the instruction was not harmless error. As the Eighth Circuit recognized in *Morris,* an adverse inference instruction "creates a substantial danger of unfair prejudice," by labeling one party as a bad actor that intentionally kept evidence from the jury.[23] That instruction was likely to prejudice this "close case" against Sears.

The plaintiffs' closing arguments to the jury, which relied on the missing evidence instruction, underscore that danger of unfair prejudice. Counsel for Allstate told the jury that "[y]ou have to question the validity of the documentation produced by Sears" and that "there are some missing holes in the documentation produced by Sears." Allstate's counsel continued: "you are going to be the conscience of the community here ... are you going to tell Sears that it is not okay to produce documents?" The Midcaps' counsel went further and argued:

> Why is Sears now coming around and looking for documents? Why did they purge documents? They knew there was an explosion, they knew there was a potential for loss here, and they are purging documents.
>
> [The trial judge] has instructed you about the adverse inference on the missing document. Simply put, if they can't produce a document that they should be able to produce, then you can infer that what is in that document is adverse to them. Among the documents that they can't produce are the delivery papers for the stove, and the receipt signed by Maria. The plaintiffs submit to you the adverse inference that you are permitted to draw is if [sic] those papers would show that Sears installed this range.

---

956 (Del.1992); *Hammond v. State,* 569 A.2d 81 (Del.1989).

**21.** *Hammond,* 569 A.2d at 87.

**22.** 1999 WL 1240863 at *1 (Del.Super.Sept. 17, 1999).

**23.** 373 F.3d at 900–03.

"Although recognizing that counsel are permitted a certain flexibility in presenting zealous jury argument, this Court has placed limits on such advocacy." [24] The above-quoted closing arguments exceeded those limits and should not be repeated in the next trial.[25] On remand, even without objection, the trial judge should act *sua sponte* to control the conduct of the court's officers, if necessary to prevent this type of transgression.[26]

Regrettably, the record below contains an even more disturbing illustration of inappropriate advocacy which, although not the subject of any argument on appeal, cannot be ignored. In closing argument, the plaintiffs' counsel stated:

> You represent the community and its attitude toward safety and what defendant Sears and Southern States and their representatives ought to do with respect to safety. Not only for these plaintiffs, but for the entire community. It is up to you to say whether the conduct of Sears and Southern States under the circumstances here meets with the community's approval. If you stamp their conduct with your approval, it will continue. It will be the standard with which others will be guided. If, on the other hand, you find in favor of the plaintiffs, you will reject this kind of conduct by your verdict. You set the standard in this community. You can set a new and better safety standard. There is no reason for Delaware to be a second class citizen in this regard. Delaware is entitled to the same standard of safety as New York City, Philadelphia, or Pittsburgh. The size of the community makes no difference, nor does the fact that Kent County is largely rural. Delaware shouldn't have to settle for second rate standards. Don't settle for second rate safety. Put Delaware and Kent County standards up there where they belong with the first class citizens.

This was an appeal to prejudice that strongly implied factual evidence that Sears and Southern States somehow discriminated against residents of suburban/rural counties like Kent County, Delaware by according them less favorable treatment than residents of more urban areas. The trial court rejected a post-trial motion by Sears to overturn the verdict on the basis of this argument. Without reaching the question of whether this improper argument would have required setting aside the verdict, we disagree with the trial judge's conclusion that Sears was at fault by not interrupting plaintiffs' closing argument to object. It is precisely when such egregious arguments are made that the trial judge should act *sua sponte* and implement a strong remedial measure.

The risk of prejudice resulting from the adverse inference instruction was especially critical here, because this case was close: two of the plaintiffs testified that they recalled seeing Sears deliver and install the range. Sears countered with testimony that under its policy in effect at the time the range was delivered, no Sears employee or contractor would have been allowed to install the range. With the evidence in such equipoise, the adverse inference instruction was all the more like-

---

24. *DeAngelis v. Harrison,* 628 A.2d 77, 80 (Del.1993).

25. *Cunningham v. McDonald,* 689 A.2d 1190, 1196 (Del.1997) (holding that a closing argument, which told the jury to "send a message to drunk drivers," was improper where it was based on the defense theory that the plaintiff-driver was intoxicated at the time of the accident giving rise to the personal injury action).

26. *Brokenbrough v. State,* 522 A.2d 851, 863 (Del.1987).

ly to tip the balance in favor of the plaintiffs. Given the state of the evidence, and the recognized potential for prejudice that an adverse inference instruction creates, the plaintiffs cannot fairly claim that the erroneous adverse inference instruction was harmless.[27]

An adverse inference instruction is appropriate where a litigant intentionally or recklessly destroys evidence, when it knows that the item in question is relevant to a legal dispute or it was otherwise under a legal duty to preserve the item. Before giving such an instruction, a trial judge must, therefore, make a preliminary finding that the evidence shows such intentional or reckless conduct. Absent such a finding, an adverse inference instruction is not justified. Because the trial judge made no specific finding in this case, and because the adverse inference instruction was critical to the plaintiffs' proof of liability, we conclude that the issuance of the instruction was reversible error and that this case must be remanded for a new trial.

We next address Sears' other claims of error because of their anticipated importance at the new trial.

## 2. The Plaintiffs' Expert Testimony

Sears' second claim of error challenges the Superior Court's admission into evidence of the expert opinion of Dr. Cyril Wecht, who testified that the decedent, Terry Midcap, had experienced at least 15 seconds of conscious pain and suffering before he died of the injuries he sustained in the gas explosion. Additionally Sears argues that, even if Dr. Wecht's testimony was properly admitted, the jury's award of $500,000 to Mr. Midcap's Estate was excessive.

Because this case will be remanded for a new trial, it is unnecessary for us to decide those claims. On retrial, however, the admission of Dr. Wecht's opinion testimony into evidence at the first trial will not constitute the law of the case, and the trial court will be free to consider anew a *Daubert*[28] motion to preclude that testimony if such a motion is made. Any *Daubert* hearing in a re-trial should involve a comprehensive exploration of whether the proffered testimony regarding Terry Midcap's consciousness is scientifically reliable and satisfies the Delaware legal standard for pain and suffering.[29]

## 3. The Collateral Source Issue

■ Sears' final claim of error is that the Superior Court misapplied the collateral source rule by excluding from the jury's consideration, evidence of the payments that Maria Midcap received (and would continue to receive) from her late husband's Social Security and Air Force pension benefits. This Court reviews questions of law, including the application of the collateral source rule, *de novo*.[30] We conclude that the trial court erred by excluding that evidence. In order to provide guidance to the trial court on remand, we explain why.

27. Heightening the importance of the adverse inference instruction issue is the undisputed fact that the range was initially installed in 1995 and that it was four years later—on a day when the plaintiffs admit that Terry Midcap moved the range—that the explosion occurred.

28. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

29. *Eskin v. Carden*, 842 A.2d 1222, 1227 (Del. 2004). *See Magee v. Rose*, 405 A.2d 143, 146 (Del.Super.1979).

30. *Allen v. State*, 644 A.2d 982, 985 (Del. 1994); *Moss v. Prudential–Bache Sec., Inc.*, 581 A.2d 1138, 1140 (Del.1990).

The plaintiffs' expert, Dr. William R. Latham III, testified that Maria Midcap's damages included the loss of her husband's military pension and his Social Security benefits. The trial court ruled that the collateral source rule applied to those payments, and as a consequence, precluded Sears from showing that those payments, although claimed as actual losses, were not losses since Maria Midcap had in fact received and would continue to receive substantial portions of her husband's benefits from those two sources.

 Under the collateral source rule, a tortfeasor is not entitled to mitigate damages in the amount of payments or compensation that the injured party receives from a collateral source.[31] The policy underlying that rule is that a tortfeasor has no interest in monies that the injured party receives from an unrelated source, and therefore has no right to benefit from those payments.[32]

 Generally, courts exclude Social Security and Air Force Pension benefits under the collateral source rule.[33] This case, however, presents a different factual scenario than in cases, such as *Davis* and *Nanticoke*, that apply the collateral source rule, because in those cases the plaintiff did not make a claim for lost Social Security or Air Force pension benefits. Rather, those cases involved the traditional application of the collateral source rule. That is not this case.

The facts in this case are more analogous to those in *Rotolo Chevrolet v. Superior Court*, a California case where the plaintiff made a claim for lost pension benefits due to his early retirement.[34] The defendant sought to introduce evidence that the plaintiff had continued to receive his pension benefits.[35] The plaintiff objected under the collateral source rule.[36] Relying "primarily on equity and common sense," [37] the court held that "[e]ven if [the plaintiff] may recover for the reduction in his pension benefits, he cannot use the collateral source rule to prevent [the defendant] from introducing evidence that he is, in fact, receiving a pension." [38]

Similarly, the plaintiffs here cannot use the collateral source rule to prevent the defendant from introducing evidence that the plaintiff was in fact still receiving, at least in part, the decedent's Air Force pension payments or Social Security benefits. That is, the collateral source doctrine should not bar evidence being offered to show that a payment that is represented to the jury as a benefit that the plaintiffs lost as a result of the decedent's injury or death, was in fact not lost, either in whole or in part, and is actually being received.[39]

---

31. *Yarrington v. Thornburg*, 205 A.2d 1, 2 (Del.1964).

32. *Id.*

33. *Davis v. St. Francis Hosp.*, 2002 WL 398706, at *1 (Del.Super.Mar. 8, 2002) (military pensions); *Nanticoke Mem'l Hosp., Inc. v. Uhde*, 498 A.2d 1071, 1075 (Del.1985) (Social Security benefits).

34. 105 Cal.App.4th 242, 129 Cal.Rptr.2d 283, 285–86 (2003).

35. *Id.*

36. *Id.*

37. *Id.* at 288.

38. *Id.*; *see also Morgan Guar. Trust Co. v. Garrett Corp.*, 625 F.Supp. 752, 756 (S.D.N.Y. 1986) (Holding that "the collateral source doctrine does not bar evidence offered to show that the identical payment claimed as lost was in fact paid.... [E]vidence of the pension plan payment was admissible to rebut a claim of lost support from allegedly lost pension benefits.").

39. *Morgan Guar. Trust Co.*, 625 F.Supp. at 756; *Rotolo Chevrolet*, 129 Cal.Rptr.2d at 286. *Cf. James v. Glazer*, 570 A.2d 1150, 1156 (Del. 1990) (recognizing that evidence excluded for

Thus, if at re-trial, the plaintiffs are permitted to "blackboard" Mr. Midcap's Social Security and Air Force pension payments as lost benefits, the defendants must be permitted to show that those payments actually were or will be received.

### B. The Plaintiffs' Cross–Appeal Against Southern States

On cross-appeal, the plaintiffs claim that the Superior Court erred by barring their expert, Alan Bullerdiek, from testifying that Southern States' failure to comply with the "GAS Check" program constituted a breach of an industry standard of care. This Court reviews a trial court's decision to admit or exclude expert testimony for abuse of discretion.[40]

At trial, the plaintiffs offered into evidence the expert opinion of Mr. Bullerdiek, who was a lead investigator in gas products and gas controls for the Consumer Products Safety Commission. The trial court found that Mr. Bullerdiek was qualified to give an expert opinion on issues involving propane safety, but precluded Mr. Bullerdiek from testifying that the Gas Appliance System Check ("GAS Check") program—a voluntary system developed by the National Propane Gas Association ("NPGA")—constituted a standard of care in the gas supply industry.

The GAS Check program recommends periodic inspections of residential propane gas services. The plaintiffs argued that Mr. Bullerdiek should be allowed to testify that GAS Check has been adopted as a standard of care in the gas supply industry, and that as a consequence, Southern States had a legal duty to inspect the Midcaps' gas system. After conducting a *Daubert* hearing, the Superior Court allowed the plaintiffs to introduce evidence about the GAS Check program, but determined that Mr. Bullerdiek could not testify that that program constituted the relevant standard of care in the gas supply industry. Mr. Bullerdiek's proffered opinion to that effect was found unreliable, because the GAS Check program was voluntary and there was no evidence that the propane gas industry generally followed the voluntary requirements of the GAS Check program.

The standard of care required of defendants in tort actions is that of a "reasonably prudent" person.[41] The inquiry in all cases is what a reasonable person would have done under the circumstances—a determination that necessarily will depend on the particular facts of each case.[42] The custom or practice in a particular industry is probative of what conduct is reasonable under the circumstances. In the context of a natural gas company, this Court has previously held that:

> The defendant is liable for injuries from gas caused by its negligence, but is not an insurer. It is presumed to know the inherent danger presented by gas and is required to exercise a degree of care commensurate with the danger. It is bound to guard against any contingency, combination of circumstances, or accidents which a person of ordinary intelligence would have foreseen as probable to happen. The extent of its duty and the standard of care it must conform to

---

one purpose may be admissible for another purpose, *i.e.*, where collateral source payments were inadmissible as substantive evidence, evidence of those payments could be admitted to impeach the testimony of a witness).

**40.** *M.G. Bancorp. v. Le Beau*, 737 A.2d 513, 522 (Del.1999).

**41.** *Robelen Piano Co. v. DiFonzo*, 169 A.2d 240, 244 (Del.1961).

**42.** *Id.* at 245.

are measured in terms of the foreseeability of injury from the situation created by it. Each case is to be decided in the light of its own facts, with due regard to the surrounding circumstances, and whether or not the subsequent act was normal and expectable. But negligence cannot be predicated upon a failure to anticipate extraordinary and unprecedented acts of others.[43]

■■■ Here, the plaintiffs urge, the evidence showed that the GAS Check program was a safety procedure that was uniformly accepted and recommended in the gas supply industry, and that therefore, a reasonably prudent propane supplier would have complied with the GAS Check program and conducted periodic checks of the Midcaps' propane system. We conclude that the Superior Court correctly held that Mr. Bullerdiek's opinion that the GAS Check program constituted a standard of care was not admissible, because there was no evidence that that program was a standard adopted by the gas supply industry as a whole.

GAS Check is designed to provide a limited inspection of certain components of a residential gas system, including its connected appliances. The information in the brief submitted by the *amici curiae*, Propane Education and Research Council ("PERC"), shows that GAS Check is a voluntary program that no state or federal agency has yet adopted as mandatory.[44] Moreover, and importantly, the Gas Check program does not specifically recommend when and under what conditions an inspection should be conducted. It is difficult to conclude, therefore, that the program constitutes a "standard" of care in the industry where the suppliers who use the program have implemented it voluntarily and in a variety of different ways. For example, some suppliers (including Southern States) conduct a check when a new customer is added to their service, or when a customer smells a propane odor. Other suppliers offer the inspection as an additional service that a customer may request, sometimes for an additional fee.

Those facts also show that it is not clear how the argued-for "standard" could be defined. How often, for example, should periodic checks occur? The GAS Check program is not standardized. Rather, it is a recommended inspection procedure that suppliers are free to adopt—and modify—as needed. For that reason as well, neither Mr. Bullerdiek nor anyone else could reliably testify that the GAS Check program constitutes a gas supply industry standard. We conclude, therefore, that the Superior Court did not err in excluding his testimony on that issue.[45]

**43.** *Suburban Propane Gas Corp. v. Papen*, 245 A.2d 795, 798 (Del.1968).

**44.** Of NPGA's 3,500 members, 800 companies (approximately sixty percent of the member companies participating in the program) have adopted the GAS Check program voluntarily.

**45.** Other jurisdictions that have considered this issue have uniformly held that gas suppliers do not have an affirmative duty to inspect interior lines, conduits, and appliances. In *Girvan v. Fuelgas Co.*, 238 Mich.App. 703, 607 N.W.2d 116, 122 (1999), the Michigan Court of Appeals held that a gas supplier has the duty to ensure that its product is delivered safely to the exterior of the premises but, in the absence of any agreement to do otherwise, that duty does not extend to the inspection of interior lines, conduits, and appliances (which is what the GAS Check program is designed to do). Similarly, in *Berthiaume v. Honeywell, Inc.*, 1992 WL 77535, at *1 (Minn. Ct.App. Apr. 21, 1992) the Minnesota Court of Appeals held that a propane supplier has no duty to inspect or repair unless it has notice that there is a leak. The Court rejected the plaintiff's argument that the national safety check system, which offered inspection at a charge to customers, was an industry custom that imposed a duty on the supplier to inspect the system.

## C. Southern States' Claims on Cross–Cross Appeal

Southern States raises two claims on cross cross-appeal; namely, that the Superior Court erred (1) by allowing Mr. Bullerdiek to testify about the condition of the Midcaps' propane cylinders and regulator; and (2) by denying Southern States' motions for summary judgment and for judgment as a matter of law.[46] Because we affirm the jury's verdict in favor of Southern States, and reject the challenges raised by the plaintiffs on cross-appeal, the claims of Southern States on cross cross-appeal are moot and we do not reach them.

### Conclusion

For the foregoing reasons, we reverse the Superior Court's judgment against Sears by reason of its grant of an erroneous inference jury instruction, affirm the judgment of the Superior Court in favor of Southern States, and remand this case for a new trial consistent with the rulings in this Opinion.

---

46. In addition to the claims discussed in this section, Southern States joined Sears in objecting to the admission of Dr. Wecht's testimony and to the Superior Court's application of the collateral source rule to benefits received by Maria Midcap. Part A of this Opinion addresses those two issues.